1

2

3

4

5

6                          IN THE UNITED STATES DISTRICT COURT

7

8                        FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   TAMI HEGGER,                                          No. C 11-04229 WHA

11              Plaintiff,

12      v.

13   UNUM LIFE INSURANCE COMPANY                    **FINDINGS OF FACT AND**
     OF AMERICA, MEDELA INC. LONG                   **CONCLUSIONS OF LAW**
14   TERM DISABILITY PLAN, AND                      **AFTER BENCH TRIAL**
     MEDELA INC. LIFE INSURANCE
15   WAIVER OF PREMIUM PLAN,

16              Defendants.

17   _____/

18                                  **INTRODUCTION**

19        In this ERISA action, plaintiff alleges that defendants improperly denied her claims for

20   disability benefits.  This order is the decision of the Court following a bench trial on the papers.

21                                     **SUMMARY**

22        This order assumes without deciding that the appropriate standard of review for the plan

23   administrator's denial of benefits is *de novo* review.  After a thorough and independent review of

24   the administrative record, this order holds that the greater weight of the evidence shows that

25   plaintiff is not disabled under the Unum-administered insurance plans.  This result does not

26   change even if plaintiff's extrinsic evidence is considered.  Judgment will be entered for

27   defendants.

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

**PROCEDURAL HISTORY**

Plaintiff Tami Hegger was previously employed by Medela Inc. as a medical device sales representative. Plaintiff left work on December 29, 2004, due to back and neck pain. While at Medela, plaintiff was covered by defendant Medela Inc. Long Term Disability Plan and defendant Medela Inc. Life Insurance Waiver of Premium Plan. Defendant Unum Life Insurance Company of America is the insurer of benefits under the plans and the plan administrator.

In April 2005 Unum approved plaintiff's claim for disability benefits. Unum continued to pay plaintiff disability benefits for five years. During this time, Unum periodically reviewed plaintiff's file and determined that plaintiff remained disabled. In November 2010, however, Unum terminated plaintiff's disability benefits. Plaintiff appealed in February 2011, and the appeal was denied three months later.

Plaintiff filed this action in August 2011 challenging Unum's denial of disability benefits. Plaintiff seeks payment of benefits due, an order that she is entitled to immediate reinstatement of benefits, interest, and prevailing party attorney's fees under ERISA. In the alternative, plaintiff requests a remand to the claims administrator.

In lieu of a live bench trial, the parties agreed that the matter would be tried based on written trial briefs and a documentary trial record submitted by the parties (*see* Dkt. No. 43 ¶ 5). This agreement was reconfirmed by the parties at the hearing. The administrative record in this action is voluminous, totaling over 3,000 pages; the parties' trial submissions and exhibits were also substantial. The administrative record previously lodged with the Court, together with the trial submissions and exhibits, constitute the complete trial record in this action.

In addition to the trial briefing, defendants also made a motion to strike certain extrinsic evidence relied upon by plaintiff. For reasons explained below, it is unnecessary to rule on the motion to strike because consideration of plaintiff's extrinsic evidence does not change the ultimate result.

It is unnecessary for this order to cite the record for all of the findings herein. Citations will only be provided as to particulars that may assist the court of appeals. Any proposal in the

United States District Court
For the Northern District of California

parties' trial briefs that has been expressly agreed to or adopted by the opposing side shall be deemed adopted (to the extent agreed upon) even if not expressly adopted herein.  In the findings, the phrase "this order finds . . . " is occasionally used to emphasize a point.  The absence of this phrase, however, does not mean (and should not be construed to mean) that a statement is not a finding.  All declarative statements set forth in the findings of fact are factual findings.

### STATEMENT OF FINDINGS OF FACT

Here are the findings of fact most important to the outcome of the case.

### THE PLANS

Medela purchased long-term disability, life, and accident insurance from Unum to fund the long-term disability and life waiver of premium plans.  The long-term disability plan provides Unum as the plan administrator with discretionary authority to review claims under the plan.  Unum's definition of disability states:

> You are disabled when Unum determines that:
>
> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
>
> - you have 20% or more loss in your indexed monthly earnings due to the same sickness or injury
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.  The loss of a professional or occupational license or certification does not, in itself, constitute disability.

The plan defines gainful occupation as a "means of occupation that is or can be expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work."  Because of a maximum benefit provision in the plan, plaintiff's gross monthly benefits are capped at $6,000 per month.  Thus, for plaintiff a job would be "gainful" under the plan if plaintiff could be expected to earn at least that much per month within twelve months of returning to work.  "Material and substantial duties" means duties that "are normally

3

required for the performance of your regular occupation; and cannot be reasonably omitted or modified."

The life waiver plan defines disability as follows:

> You are disabled when Unum determines that:  during the elimination period, you are not working in any occupation due to your injury or sickness; and after the elimination period, due to the same injury or sickness, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by training, education and experience.

The parties did not raise any issue with the definitions under the two plans, and this order finds that they do not conflict.  Under the long-term disability plan, plaintiff is entitled to disability benefits for the duration of her disability so long as she meets the definition of disability under the plan.  Under the life waiver plan, plaintiff is entitled to waiver of premiums as a consequence of her disability for as long as she remains disabled under the terms of the plan.

MEDICAL EVIDENCE OF PLAINTIFF'S PHYSICAL CONDITION

This section reviews the most salient facts from the extensive medical information in the administrative record.

On December 22, 2004 plaintiff was treated by Dr. Vernon Williams, M.D., neurology, for lower back, neck, and shoulder pain.  Dr. Williams noted that the factors that worsened the pain included "walking, sitting, motion of the painful limb/joint, lifting heavy object [*sic*], running, coughing, and sneezing."  Plaintiff reported her pain as constant, and rated the intensity as ten out of ten.  She was diagnosed with lumbar degenerative joint disease and lumbar myofascial pain.  Plaintiff left work one week later on December 29, 2004.

On February 14, 2005, plaintiff underwent an MRI that revealed a 5-mm broad-based disc protrusion at L5-S1.  On February 21, 2005, she retained and was treated by Dr. Jeffrey Olsen, M.D., pain management.  Dr. Olsen diagnosed plaintiff with lumbar disc displacement and lumbago.  Dr. Olsen specified that plaintiff could not walk long distances, carry heavy objects, or sit for long periods, and stated that plaintiff would be able to return to work after a

4

United States District Court

For the Northern District of California

1   period of three months (AR 205).[1]  In May 2005 Unum received a letter from Dr. Olsen stating

2   that he was no longer treating plaintiff and that the last time he had seen her was on February 21.

3       Dr. Olsen referred plaintiff to Dr. Stephan Barkow, M.D., who examined plaintiff on

4   March 2, 2005.  Plaintiff described her pain to Dr. Barkow as being in her gluteal region, the

5   right side of her lower back, and in her right leg.  She stated the her pain was typically a seven

6   out of ten, but on that day it was a five out of ten.  She reported that the pain was worsened by,

7   among other things, walking, carrying objects, and extended driving.  Dr. Barkow diagnosed

8   plaintiff with right S1 radiculitis and sacroiliitis.

9       On March 24, 2005, Dr. Barkow performed an epidural steroid injection and other

10  procedures.  Prior to the treatment, plaintiff reported her pain intensity as five out of ten.  In the

11  recovery room after the treatment, she rated her pain as zero out of ten.

12      In August 2005 plaintiff began treatment with a new attending physician, Dr. Mark

13  Brown, M.D., orthopedic surgeon.  Plaintiff reported pain in her neck, right shoulder, lower

14  back, and in both hips.  She reported that the pain increased with extended sitting, standing,

15  walking, driving, and carrying over 15 pounds.  Dr. Brown diagnosed plaintiff with cervical

16  spine strain/sprain with underlying degenerative-disc disease at C5-6, right shoulder strain,

17  lumbar spine strain/sprain with facet arthropathy at L5-S1, and intermittent sciatica.  Dr. Brown

18  concluded that plaintiff was temporarily totally disabled.

19      Dr. Brown evaluated plaintiff again on November 30, 2005.  Plaintiff reported pain in her

20  neck, right shoulder, lower back, right leg, and knee.  Dr. Brown's diagnosis based on that visit

21  did not change substantially from his prior diagnosis.  Dr. Brown concluded based on that

22  evaluation that plaintiff could return to work, but that she should avoid heavy work activities and

23  work activities with prolonged neck motion, sitting, or standing (AR 560).  Dr. Brown also

24  recommended vocational rehabilitation.

25      In a subsequent report to Unum, Dr. Brown confirmed that plaintiff had full-time work

26  ability.  Specifically, Dr. Brown concluded that plaintiff could sit, stand, and walk intermittently,

27

28      [1]The parties submitted three different documentary records.  All citations herein are to the primary
    claim file numbered UA-CL-LTD 000001–002870 unless otherwise noted.

but not continuously, over the course of an eight-hour work day (AR 465).  He also concluded that plaintiff could occasionally (1–33% of the time) carry 21–50 pounds, and frequently (34–66%) carry lighter loads.  Dr. Brown wrote in his report that plaintiff could work either in a sedentary activity or light activity level eight hours per day as long as she could sit, stand, or walk with a fifteen-minute break each hour (AR 465–66).

Dr. Barkow evaluated plaintiff again on March 26, 2006.  Plaintiff reported that the intensity of the pain in her lumbar spine was eight out of ten.  She also reported pain radiating down her right leg.  She reported exercising daily and Dr. Barkow recommended that she increase her physical activity.

On May 15, 2006, plaintiff was examined by Dr. Nial Morgan, M.D., an independent medical examiner, in connection with a workers compensation proceeding.  Plaintiff reported neck pain with an intensity of four out of ten, shoulder pain ranging in intensity from four to ten, and back pain with an intensity of eight out of ten.  Prolonged sitting, standing, walking, lifting, driving, and carrying all contributed to the pain.  She reported going to the gym five times a week at the recommendation of her formal physical therapist.  Her visits to the gym were for one and half hours at a time, during which she did cardio and strength training with free weights and an elliptical trainer.  She stated that she did not engage in any sports activities.

After reviewing plaintiff's medical file, Dr. Morgan diagnosed plaintiff with cervical spondylosis of C4–5 and C5–6, a herniated fifth lumbar disc with right sciatic symptoms, and lumbar degenerative-disc disease at L5-S1.  Dr. Morgan found no evidence of right shoulder orthopedic injury.  Dr. Morgan concluded that plaintiff could return to her usual occupation if she so desired without restrictions or accommodations (AR 646–47).

On May 5, 2007, plaintiff was evaluated by another independent medical examiner in connection with a Social Security proceeding:  Dr. Sohelia Benrazavi, M.D., internal medicine.  Dr. Benrazavi determined that plaintiff was able to work in a light capacity.  Dr. Benrazavi reported that plaintiff could lift and carry 20 pounds occasionally, that she could lift and carry 10 pounds frequently, and that she could sit, stand, and walk for six hours out of an eight-hour day.

On June 19, 2007, plaintiff was evaluated by David Bradley, a physical therapist referred by her attending physician.  Plaintiff reported neck pain with an intensity of six out of ten, and shoulder pain with an intensity of three out of ten.

In February 2008 plaintiff began treatment with a new attending physician, Dr. Michael Weinstein, M.D., orthopedic surgeon.  Plaintiff reported pain in her lower back, right buttock, and neck, with pain intensities reaching 8–9 out of 10.  Plaintiff reported that the pain was aggravated by, among other things, sitting, straining, lifting, working at a computer, driving, and sports.  She reported that she had to modify her activities to control her pain and could not do most things, though she did go to the gym for stretching and strengthening.  She reported that her last job "frequently" involved lifting 50–100 pound loads, and "continuously" involved lifting 25–50 pound loads.

Following a comparison of a recent back MRI with her MRI from 2005, Dr. Weinstein noted that the her back showed some disk dessication and degeneration, but was otherwise unremarkable, and that the disk bulge at L5–S1 had diminished.

In June 2008 plaintiff was examined by another independent medical examiner in connection with a Social Security proceeding:  Dr. Harlan Bleecker.  Dr. Bleecker determined that plaintiff's motor strength and range of motion in her joints and extremities were within normal limits.  Dr. Bleecker concluded that plaintiff had a cervical spine disorder but could work in a light capacity with certain restrictions on reaching.

Dr. Weinstein examined plaintiff again on July 29, 2008.  In a report submitted to Unum, Dr. Weinstein diagnosed plaintiff with chronic neck and lower back pain with no evidence of radiculopathy or myelopathy.  He stated that plaintiff's MRIs showed disc dessication and degeneration but were otherwise unremarkable.  Dr. Weinstein concluded that plaintiff would not be able to perform any kind of work, but did not explain the basis for this conclusion.  He stated that plaintiff could be expected to return to work in February 2009 (AR 1048).

In September 2008 plaintiff sought out and began treatment with Dr. Russell Petrie, M.D., orthopedist, for knee pain.  Following an MRI, Dr. Petrie diagnosed her with degenerative joint disease in her knee.  In October 2008 Unum received a report from Dr. Petrie.  The report

**United States District Court**
For the Northern District of California

1    was limited to an assessment of plaintiff's knees only, and concluded that she was completely

2    unable to work.  The report indicates that she could not carry or lift any amount of weight, bend,

3    kneel, crawl, climb stairs, or push/pull more than five pounds.  The report does not state the basis

4    for these conclusions, nor how they can be reconciled with her contemporaneous workout

5    regimen at the gym.

6            On March 25, 2010, plaintiff's file was reviewed by Dr. Robert Clinton, a doctor

7    employed by Unum.  Dr. Clinton concluded that plaintiff's condition had improved significantly,

8    and that the medical information available showed that she could stand, sit, and walk frequently.

9    Dr. Clinton subsequently contacted plaintiff's treating physician at the time, Dr. Weinstein, and

10   asked whether he concurred with the assessment.  In response, Dr. Weinstein reconfirmed his

11   prior recommendations:  plaintiff was able to work full-time, subject to certain limitations (AR

12   2109–10).  She could lift 10 pounds frequently, but only occasionally over her head.  She could

13   occasionally lift 20 pounds.  Sitting would be limited to no more than six hours per day, but she

14   could stand and walk frequently.

15           Unum contacted plaintiff on May 24, 2010, to discuss the concurrence of Dr. Clinton and

16   Dr. Weinstein.  Plaintiff objected to the conclusions of her primary care physician.

17           Three days later, plaintiff began treatment with a new attending physician, Dr. Scott

18   Stoney, M.D., pain management.  Plaintiff reported pain in her right shoulder blade region,

19   anterior chest, mid-thoracic region, and right SI joint.  Plaintiff did not report any knee pain.

20   Plaintiff reported that all of this pain ranged in intensity from eight to ten out of ten, and that she

21   could not conduct normal daily activities.  She further reported that standing, sitting, driving, and

22   lifting, among other things, aggravated her pain, but that walking improved her symptoms.  In a

23   report dated July 14, 2010, Dr. Stoney concluded that plaintiff was unable to work, but did not

24   explain the basis for this conclusion in his report.

25           In subsequent correspondence with Unum, Dr. Stoney stated that plaintiff could not drive

26   for more than 30 minutes.  On November 19, 2010, Dr. Susan Council, a medical consultant for

27   Unum, reviewed plaintiff's medical file.  Dr. Council concluded that there was no physical

28

United States District Court

For the Northern District of California

1    reason for Dr. Stoney's driving restriction of thirty minutes and that plaintiff was capable of

2    working full-time in a light duty capacity.

3          The description above covers evidence from seven of plaintiff's own physicians

4    (Williams, Olsen, Barkow, Brown, Bradley, Petrie, Stoney), three independent examiners

5    (Morgan, Benrazavi, Bleecker), and two Unum doctors (Clinton, Council).  Although plaintiff

6    was examined by and her file was reviewed by other doctors after 2004, the assessments

7    described above are the most significant.

8                          **THE SOCIAL SECURITY DENIALS**

9          Plaintiff filed a claim for Social Security disability benefits on March 28, 2007.  That

10   claim was denied on May 16, 2007, on the basis that plaintiff had the residual functional capacity

11   to perform light work — including her former occupation — with added restrictions of avoiding

12   frequent climbing, stooping, crouching, and kneeling.

13         On March 4, 2008, plaintiff filed an application for Social Security benefits.  Following a

14   hearing, an administrative law judge denied plaintiff's claim on September 27, 2010.  At the

15   hearing, independent medical expert Joseph Jensen, M.D., and independent vocational expert

16   Joseph Torres also appeared and gave testimony.  The ALJ concluded that the medical record

17   showed that plaintiff had cervical spondylosis and degenerative disc disease in her back, and

18   degenerative joint disease in her right knee, but that the evidence did not establish that she had

19   rheumatoid arthritis.  The ALJ further found (AR 2517):

20             claimant has the residual functional capacity to perform light work
               which permits lifting and carrying 20 pounds occasionally and 10
21             pounds frequently; sitting for 6 hours, and standing/walking for 6
               hours out of an 8 hour day except the claimant must change
22             positions for 2 to 3 minutes every 60 minutes at the worksite;
               occasional climbing of stairs/ramps[;] . . . occasional stooping,
23             crouching and kneeling except crawling should be avoided;
               frequent bilateral grasping and fine manipulation; occasionally
24             reaching at or above the shoulder bilaterally; and occasional use of
               pedals with the lower right extremity.
25
           The ALJ further concluded that plaintiff's medical conditions could reasonably be
26
     expected to produce her reported symptoms, but that plaintiff's "statements concerning the
27
     intensity, persistence and limiting effects of these symptoms are not entirely credible to the
28
     extent they would preclude the residual functional capacity for . . . light work" (AR 2518).

                                              9

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### OTHER EVIDENCE OF PLAINTIFF'S PHYSICAL CONDITION

Certain non-medical evidence in the record of plaintiff's condition stands out.  Most significantly, the administrative record shows that plaintiff took first place in a Tae Kwon Do martial arts tournament in early 2007 (AR 1303–1306).  In a declaration submitted with defendant's opposition trial brief — a document outside of the administrative record and targeted by defendants' motion to strike — plaintiff admits that she attained a black belt rank in Tae Kwon Do prior to 2005.  She admits that she has "occasionally" practiced her martial arts skills since allegedly becoming disabled, and that she also performed in a martial arts tournament in 2008.

Plaintiff never reported participating in Tae Kwon Do to her doctors or to Unum.  Indeed, she at times falsely reported that the she did not engage in any sports activities.  While plaintiff was practicing her martial arts skills and performing in tournaments in 2007 and 2008, she was reporting to her doctors that she was suffering from extreme, debilitating levels of pain on a regular basis.  Although plaintiff's opposition brief argues that her 2008 tournament activity involved a "slow" form of activity, plaintiff's own declaration does not so state.

Unum conducted surveillance of plaintiff's activities in 2008 and 2010.  This surveillance included taking video footage of plaintiff's activities in public.  The most significant video shows that on one day in September 2010 plaintiff spent an extended period time away from her home totaling approximately 6.5 hours.  Plaintiff left her home at 4:30 a.m. to go to the gym.  After spending 90 minutes at the gym, she went to a physical therapy appointment.  Following her physical therapy appointment, she went shopping.  After returning home at 11:00 a.m., plaintiff removed her groceries from her SUV by herself, including what appears to be a flat of small water bottles.  In the most striking stretch of video, she reached over her head to close the trunk of her SUV while carrying what appears to be a flat of canned goods under her right arm balanced on her hip.  She then opened the passenger side door, placed her purse in her right hand (beneath the flat of cans she is carrying under her arm), and then closed the passenger door to her SUV with her left hand while balancing the load.

Other surveillance videos show plaintiff taking walks with her dogs and her husband for 15 to 30 minutes at a time, and going to a matinee movie showing. She engages in all of these routine daily activities without any observable difficulty or discomfort.

An investigator retained by Unum also reported that plaintiff was observed running on a treadmill during the course of the surveillance, but that she was not videotaped running. In a sworn declaration submitted in this action, plaintiff states that the investigator's report is false because she has not jogged or engaged in running activities since 2004. This statement contradicts a letter plaintiff wrote to Unum in 2011 wherein she stated that she sometimes engages in a "slow" jog while using a treadmill at the gym.

The administrative record also shows that plaintiff engaged in substantial amounts of travel after leaving her work due to disability. Plaintiff traveled for work-related conferences, including trips to Phoenix, Orlando, and a trip to Las Vegas for a five-day convention while working for Hygeia, a competitor of her former employer. She has also been able to take vacations in Hawaii a couple of times per year.

Finally, the evidence shows that plaintiff worked at least intermittently following her departure from Medela, and that she made false and misleading representations to Unum and her physicians regarding her work. Although plaintiff repeatedly told Unum that she was not working, she reported to a physical therapist on June 19, 2007 that she was "self-employed." Unum followed up on this information and learned that plaintiff was a 50% owner with her husband of a business called the Hegger Insurance Agency. For the years 2004–07 plaintiff reported taxable self-employment income of $3,433, $10,950, $15,390, and $26,563, respectively. On March 28, 2008, Unum asked plaintiff whether she owned a business and was self-employed. Plaintiff denied that she was self-employed and stated that she had never owned a business. Thirteen days later plaintiff filed amended tax returns for 2005 and 2006 changing the classification of the self-employment income she had received for those years as non-taxable because "she was not active in the Hegger Insurance Agency" (AR 1463).

After learning that plaintiff was working for Hygeia and had attended the conference in Las Vegas in July 2008, Unum contacted plaintiff to ask whether she had returned to work.

11

1   Plaintiff reported that she was not working and did not disclose that she had attended the

2   conference in Las Vegas.  When Unum later specifically asked plaintiff whether she had

3   attended the conference in Las Vegas, plaintiff confirmed that she had, but claimed she was not

4   paid for her work.

5          In July 2009 plaintiff submitted a form to Unum reporting that she had returned to work

6   but was not getting paid.  In August 2009 plaintiff reported to Unum that although she was

7   working for Hygeia part-time, she was only earning $30–40 per month.  The evidence shows,

8   however, that in 2009 plaintiff worked at home for Hygeia for 10 months on a flexible schedule

9   and earned over $36,000.  Unum did not learn this information until it was disclosed in the

10  ALJ's social security denial.

11                          **UNUM'S VOCATIONAL ANALYSES**

12         Plaintiff worked for Medela, Inc. as a sales representative for over 20 years.  At the time

13  she stopped working, she was a field sales representative for Medela breastfeeding and OB/GYN

14  products.  Her work duties included office-based activities as well as driving in a car to and from

15  clients.  Plaintiff's salary plus commissions totaled approximately $156,000 per year.

16         During the five-year period that Unum paid plaintiff disability benefits, Unum regularly

17  conducted vocational analyses and "roundtable" reviews to assess plaintiff's ability to work in

18  light of her medical conditions.  The first vocational analysis in November 2006 assessed

19  whether plaintiff could perform her prior job duties subject to several limitations, including

20  occasionally lifting no more than 50 pounds and workdays limited to eight hours of light or

21  sedentary activity with 15 minute breaks every hour.  Unum concluded that plaintiff was able to

22  work, but that the work would not meet the standard for a "gainful occupation" under the

23  disability plan.

24         The second vocational analysis was conducted between December 2008 and January

25  2009.  The analysis relied on information from plaintiff's physicians showing that her back

26  conditions had improved and she would not be precluded from working in a light capacity.  Due

27  to arthritis in her knee, the vocational assessment assumed that she could not engage in

28  prolonged standing and walking.  The assessment did not analyze whether plaintiff could engage

United States District Court

For the Northern District of California

in "any gainful occupation," but rather whether she could engage in her prior occupation of field sales representative.  Unum concluded she could not.

In February 2009 plaintiff reported to Unum that she had been offered a full-time job as a medical device sales representative for Hygeia.  During a subsequent communication, plaintiff reported that she also had begun working for Hygeia on a part-time basis in February.  Unum conducted a third vocational assessment in May 2009.  The vocational analysis concluded that plaintiff was still precluded from working in her former occupation as a field sales representative.

Unum also conducted occupational analysis of the full-time position at Hygeia to determine whether it would affect plaintiff's disability benefits.  The occupational analysis concluded that the position was equivalent to a regional sales manager.  Unum concluded that plaintiff's work for Hygeia would not affect her existing disability benefits under the plan.  Plaintiff worked hours that were full-time or close to full-time for Hygeia through November 2009.  She then resigned from that position because it required extensive travel and because she felt unable to work a regular work day.

In January 2010 Unum conducted a roundtable assessment wherein several Unum employees and consultants collaboratively reviewed plaintiff's file.  The review concluded that plaintiff remained precluded from performing the duties of her regular occupation.  This review, however, noted certain conflicting information.  Although her prior vocational assessment had assumed that she was limited from prolonged standing and walking based on her knee, her work with Hygeia — which was similar to her prior job at Medela — had required both.  Plaintiff was no longer reporting her knee problems as a significant issue.  Plaintiff also did not receive medical treatment or consume medication at levels consistent with the level of extreme pain that she had reported.  The assessment recommended follow-up investigation with plaintiff's physician.

In early 2010 Unum investigated whether plaintiff was qualified for gainful employment other than her former occupation, as well as whether her 20 years of sales experience should affect the calculus.  The third-party database usually used by Unum did not reveal any relevant

United States District Court

For the Northern District of California

occupations in her area that would meet the gainful occupation criteria.  This was in part because sales personnel were not usually fully compensated for prior experience when they started, and because plaintiff had been out of work for six years.

Unum conducted follow-up market survey research using from other sources, including plaintiff's former employer and job postings available online.  A subsequent vocational analysis in May 2010 determined that the third-party database information Unum previously relied on was incorrect.  Although plaintiff's work experience should be heavily discounted, she could be expected to earn $60,000 to $75,800 in her prior occupation and $41,000 in commissions.  In other words, her work could be "gainful" under the plan.

Unum conducted additional vocational analysis through the end of 2010.  Using additional third-party data, the analysis again concluded that even after heavily discounting plaintiff's 20 years of experience, she could still be expected to meet the gainful criteria if she returned to her former occupation.  The analysis also updated the assessment of the physical activity her prior job would require.  In particular, it would include intermittent and protracted periods of sitting, standing and walking; frequent travel; and occasional lifting up to 20 pounds.  Unum also determined that her car could modified if plaintiff's knee conditions precluded her from using her right foot to drive.

### TERMINATION OF BENEFITS

Unum terminated plaintiffs benefits on November 24, 2010.  The grounds for the termination were that plaintiff was physically able to perform her own occupation as a field sales representative, and that the occupation would provide her with a gainful wage as defined by the plan.  The termination letter expressly relied on the medical information in plaintiff's file, the results of the vocational analyses, the SSI denial, and the surveillance information.

Plaintiff appealed.  After collecting a limited amount of additional evidence, Unum denied plaintiff's appeal in May 2011.  As stated, plaintiff commenced this action in August of 2011.

1

2                    **ANALYSIS AND CONCLUSIONS OF LAW**

3          The default standard of review in a denial of disability benefits action under ERISA is *de*

4   *novo*.  If the plan confers discretion on the plan administrator to determine eligibility for

5   benefits, however, then the standard of review shifts to abuse of discretion.  *Firestone Tire &*

6   *Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When the standard of review is *de novo,*

7   "district courts have a responsibility under the ERISA framework to undertake an independent

8   and thorough inspection of an administrator's decision."  *Silver v. Executive Car Leasing*

9   *Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006).  Plaintiff carries the burden of

10  proof to show that she was entitled to benefits under the plan.  *Muniz v. Amec Const. Mgm't,*

11  *Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).

12         Our court of appeals recently summarized a court's role in reviewing a plan

13  administrator's denial of disability under an abuse-of-discretion standard, with structural conflict

14  of interest, as follows:

15              Under this deferential standard, a plan administrator's decision
                will not be disturbed if reasonable.  This reasonableness standard
16              requires deference to the administrator's benefits decision unless it
                is (1) illogical, (2) implausible, or (3) without support in inferences
17              that may be drawn from the facts in the record.  This abuse of
                discretion standard, however, is not the end of the story.  Instead,
18              the degree of skepticism with which we regard a plan
                administrator's decision when determining whether the
19              administrator abused its discretion varies based upon the extent to
                which the decision appears to have been affected by a conflict of
20              interest.

21                              *               *               *

22              While not altering the standard of review itself, the existence of a
                conflict of interest is a factor to be considered in determining
23              whether a plan administrator has abused its discretion.  The weight
                of this factor depends upon the likelihood that the conflict
24              impacted the administrator's decisionmaking.  Where, for example,
                an insurer has taken active steps to reduce potential bias and to
25              promote accuracy, the conflict may be given minimal weight in
                reviewing the insurer's benefits decisions.  In contrast, where
26              circumstances suggest a higher likelihood that the conflict affected
                the benefits decision, the conflict should prove more important
27              (perhaps of great importance).

28

*Stephan v. Unum Life Ins. Co. of America*, 697 F.3d 917, 929 (9th Cir. 2012) (internal quotation marks and citations omitted).

Procedural irregularities may also affect the standard of review.  In the ordinary situation, procedural errors are a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion.  If, however, the plan administrator's procedural defalcations amount to a wholesale violation of ERISA, *de novo* review applies.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 971–74 (9th Cir. 2006).

Plaintiff claims that evidence of Unum's conflict of interest should temper any application of the abuse of discretion standard, and that Unum's decision was tainted by procedural irregularities.  Plaintiff's complaints in this regard are multiple.  *First*, plaintiff contends that defendant added a new reason for terminating plaintiff's benefits on appeal, which deprived plaintiff of a full and fair review.  *Second*, Unum used inconsistent criteria during the many vocational analyses.  *Third*, Unum failed to adequately investigate the salary information used in the vocational analyses.  *Fourth*, Unum has a history of improperly denying benefits that is established in other ERISA actions.  *Fifth*, because Unum withheld a document relating to its termination decision on the basis of attorney-client privilege, it must admit that its interests diverged from those of plaintiff.

It is not necessary to rule on the appropriate standard of review.  This order assumes without deciding that the appropriate standard of review is *de novo*.  This is because, as explained further below, the greater weight of the evidence in the record shows that plaintiff was *not* disabled under the plan definition.  This result pertains even if plaintiff's extrinsic evidence is received and considered.  Thus, *a fortiori*, defendants would also prevail under the deferential abuse-of-discretion standard.

### PLAINTIFF IS NOT DISABLED UNDER THE PLAN

There is a clear medical consensus among nearly all of plaintiff's numerous physicians — whether retained by plaintiff, independent, or retained by Unum — that plaintiff was able to work in a sedentary or light duty capacity.  At least eight physicians arrived at this fundamental conclusion.  Although several physicians concluded at times that she was unable to work, these

United States District Court

For the Northern District of California

diagnoses were expressly temporary.  Most of the physicians concluded that plaintiff would be subject to certain limitations when returning to work; the precise recommendations in this regard varied.

The exceptions, and distinct minority, are Drs. Petrie and Stoney.  Dr. Petrie's October 2008 conclusion that plaintiff was totally unable to work is not persuasive.  Above all, it conflicts with the fact that plaintiff had already begun working for Hygeia by that time.  Dr. Petrie also based these conclusions solely on plaintiff's knee, rather than a broader assessment of plaintiff's abilities, and did not explain the basis for his work recommendations.  Dr. Petrie specifically concluded that plaintiff could not carry or lift any amount of weight, bend, kneel, crawl, climb stairs, or push/pull more than five pounds.  These limitations are flatly inconsistent with plaintiff's admitted other physical activities in the same general time frame, such as martial arts practice and going to the gym five days a week.

Dr. Stoney's reports are supported with explanations and merit some consideration. However, they are outweighed by majority opinion that plaintiff was able to work.  Dr. Stoney's conclusions are also contradicted by plaintiff's athletic and work activities described above.

Defendants contend that the timing of plaintiff's switches from doctor to doctor suggests doctor-shopping.  The record is ambiguous on this point.  Nevertheless, it is noteworthy that from 2005 onward, plaintiff was evaluated by numerous physicians other than the ones named above for the same pain conditions described above, as well as for other complaints.  The parties' submissions do not clearly reveal the contributions of these physicians (if any) to plaintiff's diagnoses and care regimen.  The sheer number of physicians that plaintiff visited over the years, however, does support an inference that plaintiff engaged in doctor-shopping.

The evidence establishes that plaintiff suffers from legitimate medical conditions and that these conditions cause her some level of pain.  She is not, however, disabled.  Since leaving work due to her alleged disability, she has not lived the life of a person who is suffers from frequent, excruciating, and debilitating pain.  Plaintiff has continued her advanced martial arts training and even competed in Tae Kown Do tournaments.  She goes to the gym, runs errands, and carries her own groceries without assistance.  Her trips outside the home involving walking,

United States District Court

For the Northern District of California

driving, and standing exceed six hours in a stretch. She takes vacation trips to Hawaii a couple of times each year. And, starting at least in 2008, plaintiff has intermittently worked in her prior occupation of medical device sales.

Much of the evidence of plaintiff's alleged disability comes from plaintiff's own statements to her doctors and to Unum. Yet, plaintiff's credibility withers under scrutiny. Plaintiff made false and misleading statements to her own doctors and to Unum. At the same time she told doctors that she did not participate in sports and that her level of pain prevented her from engaging in normal life activities, she was continuing her training as a black belt in Tae Kwon Do and competing in Tae Kwon Do tournaments. Right after representing Hygeia at a medical device conference in Las Vegas, plaintiff falsely reported to Unum that she was not working. After later admitting to Unum that she was working, plaintiff stated that she was earning only 30–40 dollars a month, but eventually reported over $36,000 in income for the year on her tax returns. Plaintiff represented to this Court in a declaration that she has not engaged in jogging activities since 2004, but in a prior letter to Unum plaintiff stated that she sometimes does jog while using a treadmill at the gym. There are more examples in the record. The record is also replete with inconsistent characterizations by plaintiff of her level of pain and impairment.

Plaintiff argues that the surveillance videos did not reveal any activities inconsistent with plaintiff's reported activities. This is true, as far as it goes. The surveillance information is inconsistent, however, with plaintiff's reports of debilitating, excruciating pain. It is also inconsistent with the reports by Drs. Petrie and Stoney that plaintiff is totally unable to work. Plaintiff correctly points out that 50 hours of surveillance and 12 minutes of video cannot accurately represent her complete life activities since 2004. Nevertheless, the surveillance evidence is entitled to some weight.

More generally, plaintiff argues that Unum cannot use the evidence it had while it was paying disability benefits as evidence supporting a subsequent denial of benefits. Plaintiff cites *Fairbaugh v. LINA*, 737 F. Supp. 2d 68, 81 (D. Conn. 2010) for the proposition that "it is error

18

**United States District Court**
For the Northern District of California

1  for a claim administrator to rely upon evidence that it had when it approved the claim as a basis

2  for termination of benefits" (Plaintiff's Br. 22).  *Fairbaugh* does not stand for such a proposition.

3        To the extent that *Fairbaugh* questions plan administrator flip-flopping on the

4  significance of medical evidence, it comports with the law in this circuit.  An initial grant and

5  payment of disability benefits may be evidence relevant to whether a claimant is disabled, but it

6  is not necessarily dispositive.  *See Muniz*, 623 F.3d at 1296.  Likewise, Unum's five years of

7  payments to plaintiff weigh against the propriety of Unum's subsequent denial of benefits, but

8  this fact alone is not dispositive.  Unum is not precluded from changing its evaluation, taking a

9  fresh look at a claim file, or re-interpreting evidence in light of developments in the

10  administrative record over time.

11        **PLAINTIFF CAN OBTAIN GAINFUL EMPLOYMENT**

12        The parties dispute the meaning of the plans' definition of disability insofar as it applies

13  to plaintiff.  Unum contends that under the plan language, it only needed to determine that

14  plaintiff could return to her former occupation.  Although Unum *also* assessed whether her work

15  would be gainful, doing so was superfluous.  Plaintiff responds that denying her disability

16  benefits under the plan required both a determination that plaintiff could return to work, and that

17  her work be gainful in the sense that she could earn more than $6,000 per month within 12

18  months.

19        Is not necessary to construe the Unum plan terms.  Assuming, *arguendo*, that the Unum

20  must establish both requirements, this order finds that they are satisfied.  The greater weight of

21  the evidence shows both that plaintiff was able to return to her former occupation of medical

22  device sales, and that plaintiff would earn a "gainful" salary under the plan if she did so.

23        As explained above, there is a clear medical consensus that plaintiff was able to work in a

24  sedentary or light duty capacity.  Plaintiff's medically-imposed work restrictions would limit her

25  ability to perform as a medical device sales representative somewhat.  Over the long term, these

26  limitations could prevent her from rising as far or as quickly as others.  The evidence shows,

27  however, that plaintiff remained employable as a medical sales representative after she left work.

28

United States District Court

For the Northern District of California

1    Plaintiff's recent, extended period of full-time work for Hygeia demonstrates in particular that

2    she remained employable.

3        The preponderance of evidence in the record also shows that plaintiff would be able to

4    find gainful employment as defined by the plan if she returned to work.  This issue is a close

5    question, as the facts are somewhat sparse and conflicting.  At the time Unum denied plaintiff's

6    appeal, she had been out of work for many years, diminishing the value of her 20 years of sales

7    experience.  Plaintiff also takes issue with the market survey Unum conducted to supplement the

8    information supplied by the third-party database.  Although plaintiff's objections to the quality

9    of the market survey are noted, Unum based its analysis on several sources.  The preponderance

10   of the evidence shows that plaintiff could earn at least $6,000 per month within 12 months of

11   resuming work as a medical device sales representative.

12                        **DEFENDANTS' MOTION TO STRIKE**

13       Ostensibly in support of her contentions that Unum's decision was affected by its conflict

14   of interest, plaintiff submitted a variety of extrinsic evidence.  Plaintiff also uses some of this

15   evidence on the merits.  Defendant moves to strike plaintiff's submissions.

16       As a general matter, when the standard of review is abuse-of-discretion the review of an

17   administrator's denial of benefits is limited to the administrative record.  However, if procedural

18   irregularities are present that have prevented full development of the administrative record, the

19   Court has discretion to take extrinsic evidence in order to recreate what the record would have

20   been had the procedure been correct.  "[W]hen de novo review applies, the court is not limited to

21   the administrative record and may take additional evidence."  *Abatie*, 458 F.3d at 972–73.

22       Ruling on defendant's motion to strike is unnecessary.  Because this order assumes that

23   the appropriate standard of review is *de novo*, there is no need to admit the extrinsic evidence in

24   support of an alleged conflict of interest that would temper the abuse-of-discretion standard.

25       As to the merits, judgment for defendants can be sustained on the basis of the

26   administrative record alone.  When all of plaintiff's extrinsic submissions are considered, this

27   order holds that even if admitted, these submissions do not materially alter the results herein.

28

                                    20

**United States District Court**
For the Northern District of California

1    Defendants have also submitted extrinsic evidence.  Plaintiff does not object to this

2 evidence on evidentiary grounds and it shall be admitted into the record.  Upon consideration,

3 Defendant's extrinsic evidence also does not materially affect any of the conclusions herein.

4                         **PLAINTIFF'S ALTERNATIVE REQUEST FOR A REMAND**

5    In the alternative, plaintiff requests a remand back to the plan administrator in order to

6 challenge reasons for denying plaintiff disability benefits that Unum allegedly raised for the first

7 time on appeal.  This order already applies a *de novo* standard of review that considers the

8 entirety of the record and finds in favor of defendants.  A remand is therefore inappropriate and

9 plaintiff's alternative request is **DENIED**.

10                                        **CONCLUSION**

11    Following a thorough and independent review of the evidence, this order finds that

12 plaintiff was not disabled under the plan when Unum denied plaintiff's appeal.  Defendants'

13 motion for judgment is **GRANTED**.  Judgment will be entered for defendants.

14

15    **IT IS SO ORDERED.**

16

17 Dated:   March 1, 2013.                                    _____

18                                                           WILLIAM ALSUP
                                                            UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28